UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 23-cr-10127-LTS |
| CARLOS FONSECA, | |
| Defendant | |

## MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION

The government submits this memorandum in support of its recommendation for **33 months of incarceration** for the Defendant, followed by three years of supervised release. This recommendation reflects the seriousness of the offense, and the need for deterrence and just punishment for this type of coordinated theft.  The Defendant and his coconspirators targeted businesses and hardworking residents, upending their lives for days and weeks, stealing from them, rendering their cars and trucks entirely useless, and forcing them to incur thousands of dollars in deductible and repair costs.  A sentence of 33 months fully accords with the sentencing factors under Section 3553(a).

## THE ADVISORY SENTENCING GUIDELINES & PSR[1]

### A.  Offense Level

The government disagrees with the offense level calculation provided by Probation, which calculated the offense level in the final Presentence Report to be 19 (PSR ¶¶250-274).  The government objects to the failure to find the 2-point increase for sophisticated means under USSG § 2B1.1(b)(10)(C).

---

[1] The government refers to the United State Probation Office as "Probation", the Presentence Report by page (PSR p. _), or paragraph (PSR ¶_), and references to the docket are by entry number (ECF #_).  In addition to the content of the PSR, the government refers to a report concerning the recent catalytic converter theft activity that was previously filed with the Court. See e.g., ECF #188-1. The victim impact information is summarized from the Victim Questionnaire Spreadsheet was also previously submitted to the Court (ECF #188-2) and is referenced by the stated Victim number in the spreadsheet (Victim #_).  Additional victim impact statements were filed with the Court in redacted form ECF #188-3, 4 & 5. The complete victim list was also submitted to Probation and forwarded to the Court in spreadsheet form. The document specifies the date, victim, make/model of vehicle and other details of the thefts (FINAL VICTIM SPREADSHEET – 2023.10.25), and is a basis from which the Court can consider the pattern of repeated targeting of certain businesses, locations, makes and models.

The government's substantive arguments regarding its objection to the PSR have been made elsewhere, and will not be repeated.

Consequently, the government takes the position that the Adjusted Offense Level for Group One **should be 24**. *Compare* ECF #170 (Plea Agreement). Then, acceptance of responsibility furthers reduces the offense level by 3. Therefore, the government believes the <u>Total Offense Level should be 21</u> (PSR ¶¶250-264). With an undisputed criminal history score of three, the Defendant's criminal history category is II (PSR ¶¶268-269).

**B.  Guidelines Sentence Range ("GSR")**

Under the government's offense level calculation of 21 (as reflected in the plea agreement), and CHC II, the government believes the GSR should be 41-51 months. To the extent necessary, the government advances its sentencing recommendation as including a request for a downward departure or variance to the requested 33 months.

<u>**ARGUMENT**</u>

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment. <u>See</u> 18 U.S.C. § 3553(a)(2)(A). The sentence must also afford "adequate deterrence" for both the defendant and others. <u>See</u> 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. <u>See</u> 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). Consideration of the § 3553(a) factors demonstrates that a sentence of 33 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

**A.     Nature and Circumstances of the Conspiracy and Thefts**

The Department of Justice prioritized the investigation and prosecution of catalytic converter thefts

due to the rising number of thefts across the country.[2]  Those cases targeted businesses profiting from the purchase of stolen converters, and the sale of the stolen "cores" of those converters to other entities. Unlike those other prosecutions, Operation Cut & Run investigated the actual theft incidents, identified the suspects and sought to hold them accountable for the specific thefts they committed. This case is somewhat unique in that the actual thefts were proven, the loss amounts can be considered, and the impact of the crimes on the actual victims can directly factor into the Court's decision-making at sentencing.  In short, this entire investigation was predicated upon targeting those who themselves were doing most harm to businesses and residents, and holding them accountable for the frustration, stress and financial costs they imposed on the lives of others.[3]

To be sure, this conspiracy is charged with committing at least 500 identified thefts on specific nights in specific towns, with specifically identified victim vehicles.  However, the Indictment only identifies thefts that were supported by at least three salient pieces of evidence tying the thefts to these Defendants, such as: the MAROON ACURA MDX being visible on video committing at least one theft in the area that night; cell site location information or GPS information showing the Defendants operating in the general area that night; and some form of digital evidence corroborating the activity, such as a note, or text message.  Many more thefts were suspected and not able to be sufficiently proven.  Even so, this case and the very large number of actual thefts charged against the actual thieves is unique in the country.

### 1.   Sophisticated Nature & Repetitive Conduct

The government wishes to be clear: this is no mere property crime. For well over a year, this conspiracy stole hundreds of catalytic converters and made hundreds of thousands of dollars.  This Defendant, for his part, is responsible for 20% of those specified thefts (over 100 vehicles). The crimes

---

[2] *See* Department of Justice, Press Release, "Justice Department Announces Takedown of Nationwide Catalytic Converter Theft Ring," November 2, 2022, available at https://www.justice.gov/opa/pr/justice-department-announces-takedown-nationwide-catalytic-converter-theft-ring (press release related to prosecution of DG Auto and related defendants in the Eastern District of California, and Northern District of Oklahoma).

[3] And in so doing, this case revealed that the same large-scale buyers targeted in other prosecutions for the business were profiting from these Defendants actual thefts as well.

demonstrated a honed precision in their execution and expertise in their planning and concealment. They were cross-jurisdictional in scope and brazen in their nature.  These were not crimes of opportunity or desperation, and they were not crimes committed by those who were down on their luck or suffering from some other issue. Far from it – these crimes were the product of concerted effort, discernment, skill and an overarching goal of seeking as much as profit as possible.

The Defendants targeted vehicles along carefully mapped routes and used tools and implements purchased purposefully for the crimes. They researched the most valuable vehicles to target and spent effort doing "homework" to identify where they would be found. The crimes were committed brazenly: they targeted entire fleets of vehicles, stealing from dozens in a single night, systemically striking each truck or van parked at a business, or boldly entering onto a driveway or parking lot to target a resident's personal vehicle parked outside their home.  For each victim, the Defendants plainly did not care how their slight profit from each vehicle would affect the victim. And they did not fear law enforcement.

The thieves were skilled and well-prepared. The catalytic converter thefts were predicated upon the use of an internet application that provided real-time pricing for catalytic converters quantifying the commodity prices of the amounts of precious metal in a particular vehicle's converter. Equipped with special knowledge of the values on the black market and technical skill and knowhow, the suspects targeted specific makes and models of vehicles to maximize the profits. They devoted time and energy to locate places and businesses where large numbers of these vehicles were located in order obtain an economy of scale. The thieves would travel hundreds of miles, hours on end in a single night, to specifically target businesses whose fleets were comprised of highly valued vehicles. As R. DAVILA boasted to N. DAVILA in text messages, they would each be making $4,000 per night, despite the market prices for the precious metals having declined.

The conspirators used a specific vehicle well-suited to the job that was equipped with anonymous license plates that they believed would not provide an avenue of investigation for law enforcement. They disabled cellular phones and travelled hundreds of miles on most trips in order to spread their crimes across the state and region, and crossed state lines to deter any pursuits.  Their tools had sharp blades and fresh

batteries. They deployed these tools with skill and the cutter got underneath the vehicle with the reciprocating saw within seconds. For most thefts, it would take less than a minute to remove the converters from the vehicle and move on to the next. In general, they operated with a sense of impunity that was born from an extremely successful modus operandi that had resulted in hundreds of thefts and hundreds of thousands of dollars in profit.

The nature and circumstances of these crimes reflect the deliberate and considered choice to target and victimize others for personal gain. Because of the thefts, a business would suffer their entire fleet of vans being looted in one night, only to have other vehicles at a different location targeted on a later night. The individual victims were left with little recourse except to cobble together enough money to pay the costs to repair and rebuild what was left of their day and week after the inconvenience of losing their vehicles for the foreseeable future.  The Defendant chose to target others and steal from hardworking members of society. He made this choice instead of working in a legitimate business or industry and applying his obvious skill and discipline to a positive endeavor. The reason for this choice was obvious: the thousands of dollars in tax-free profits he could make each night. As a result, the nature and circumstances of the thefts require a serious sentence consistent with the government's recommendation.

### 2.  Victim Impact

There are over 300 separate victims in this case and dozens for which this Defendant is personally responsible. The victims include businesses and individuals from all walks of life and all parts of Massachusetts and some from New Hampshire. They included a food pantry, families, automotive businesses, tradesmen, a bakery, single parents, a home healthcare provider, and the elderly. The conspirators would target your vehicle, steal its converter, and you would have to deal with the vehicle being disabled for potentially weeks on end.

While it may not seem so, this case proves that catalytic converter theft is a profoundly personal crime, even for the businesses who were targeted. The thieves would target a vehicle that is parked in a driveway of a home or parking lot of business. They would need to trespass to gain access to the car, get under it and cut away the converter. A number of victims have provided specific information to inform the

Court about how the loss of their vehicles upended their lives and affected them financially.

For individuals, there is a significant sense of violation in the theft since their vehicle is usually parked close to where they were sleeping and there is an element of surprise in the morning that this has happened essentially under their nose.  Businesses suffered as well. They would see their trucks or vans disabled for weeks on end and then be forced to bear the costs for repairs and rental vehicles. But that is only their bottom line – the goodwill of the businesses also deteriorated due to these crimes: their customers would be left waiting for deliveries or service calls that could not be made, and workers were forced to make do with their own vehicles or do the work when other trucks were available.

For some businesses who were targeted on multiple nights, these crimes also created a sense of impending disaster that they experienced. This Court should consider the fear and foreboding that invaded the minds of the business owner or operations manager, who knows that it is only a matter of time before the thefts and disabling of their trucks forces them to endure another round of a multi-week repair cycle and thousands of dollars in costs.

For the individual victims, the impact is readily identifiable and understandable. Consider how your life would be affected if in the moments you went to use your car in the morning you learned it was damaged and would be unavailable for few weeks. The simple act of going to work and getting you and your family ready for that day is completely frustrated.  Then consider: the loss of your vehicle for weeks, the stress created in getting things accomplished and meeting obligations both personal and professional, the time that these problems take from you and your family, and the unnecessary stress and costs you have to bear, after already playing by the rules of society in every other respect.

The victim statements expressing these sentiments can be summarized as follows:[4]

- A "medical/life sciences supply company" in Canton, MA reported being targeted on two nights for five vehicles, and suffering $12,114 in costs.  See Victim #1.  They lost the use of their vehicles for over 60 days collectively, but were able to use other vehicles to perform all the deliveries. This victim reported: it is a "small minority owned company" that is operating

---

[4] As this is the fifth sentencing, the government will not separately file the victim statements or questionnaire for this Defendant. Rather, the government makes reference to the previously filed exhibits and refers to the Victims by the number identified in the questionnaire.  See ECF #188-2.

in a crowded industry and as such we run on very slim margins." <u>See</u> ECF #188-3. The victim reports:

> From a processing standpoint, at that particular time we were fortunate enough to have enough vehicles to cover deliveries, so impact to us serving our customers was minimal. We did, however, have to take a hit financially to the amount of $12k to offset the cost of repair that insurance didn't cover.

> Not only did this theft have an impact on our bottom line, it also took a bit of a toll on us psychologically. Our trucks were locked up in an area of the property that was lighted, fenced in with barbed wire. This did not deter the thieves from coming in and cutting our vehicle's exhausts into pieces. We shared the video of both events with the Canton police. Basically, we felt helpless!!!! Every Monday I would dread coming into the office and having a driver tell me, 'we got hit again'.

<u>See</u> ECF #188-3.

- One individual reported that they "had to share cars with [their] Fiancé and there were several days I was unable to drive to work because of schedule conflicts." <u>See</u> Victim #2.

- An automotive business reported that their customer's truck was targeted, and their business was impacted, and the "theft forced [the business] to reevaluate our policy of leaving our customers vehicles outside our gate" and "[p]revent[ed them] from accommodating our customers['] requests" in the future. <u>See</u> Victim #3. Insurance paid the repair claim, which was nearly $8,000.

- A paving business was forced to pay $8,60 to repair costs but was otherwise unaffected because the truck was a rental. <u>See</u> Victim #4.

- A sheet metal business reported having to pay over $2,500 in a deductible, lost access to its truck for over two weeks, and lost about $10,000 in productivity.  <u>See</u> Victim #5.  The loss of their truck forced their work to be completed on overtime and made them unable to prepare for future job deliveries.

- Another business had to pay $1,000 in a deductible, off the $7,428 repair claim, and lost the use of their van for two months. <u>See</u> Victim #7.  During this period, the employees had to use their personal vehicles to get to the job sites.

- A food service business was forced to pay $8,200 in repair costs, and lost use of their truck for 21 days during repairs.  <u>See</u> Victim #8.

- A soil company had to pay $3,101 and lost use of their van for over three weeks during repairs. <u>See</u> Victim #9. They reported about 5 to 10 hours in lost time as they dealt with the theft.

- One individual had to pay $798 to repair their Corolla, and lost use of their car for 26 days. <u>See</u> Victim #11. During that time, they had to pay about $5,000 in costs associated with getting groceries and suffered a $96 increase to their insurance premium.

- A kitchen business reported $5,648 in costs to repair their truck, and lost two days of productivity, and three delivery days that they were able to reschedule. <u>See</u> Victim #12.

- A financial service business reported $1,943 in costs to repair the vehicle, and while they did not experience any loss of business or wages, the "theft did affect [them] emotionally." <u>See</u> Victim #13.

- A food pantry was targeted twice and had to pay $2,318 in costs to repair, and lost access to their truck on eight days on each occasion. <u>See</u> Victim #14. The organization has one truck that helps them distribute assistance to 4,351 persons in 2023. The food pantry provided the following information in its victim statement (<u>see</u> ECF #188-4):

  > Last year 695,704 pounds of food was distributed to our neighbors at these locations.

  > Another 38,713 pounds of food was sent home with children in partnership with our public school system to ensure that they had food over weekends.

  > Our food rescue program in partnership with Stop & Shop, Shaws, Whole Foods Market and B.J. 's allowed the pantry to collect 215,904 pounds of food, a critical resource we rely on to meet the needs of our neighbors.

  > All these programs were in jeopardy. But thanks to business owners in the community who provided us with use of their trucks when our truck was being repaired, we were able to conduct business as usual and are eternally grateful for their support.

  > Although our insurance company covered a majority of the costs, the out of pocket dollars were $2,318. Our organization raises money through donations, fundraisers as well as grants. We were very grateful to the donations we received to help cover the shortfall.

  > The food pantry is a volunteer based organization, and when word of the theft spread, many were brought to tears and outraged that someone could do this. After the 2nd theft, anger at this being done, not only to the food pantry, but to our neighbors in need, could not be measured. Our truck is a symbol of hope to -residents who are food insecure. We, as a community, felt violated in a way that cannot be quantified. To this day, we are still emotionally impacted by this crime, and wonder how individuals could be so callous as to impact our most vulnerable seniors, families and children.

<u>See</u> ECF #188-4.

- One individual from Fitchburg reported being targeted twice, and had to pay a $300 for each claim. <u>See</u> Victim #15.  The victim had to use two tows under AAA, and lost access to the vehicle for five days.  They suffered the loss of two days of pay and increases to their insurance premiums.  The victim noted the intrusive nature of the theft: "Car was parked in my own driveway at the time" and reported a sense of helplessness from suffering the crime twice, stating that "this is happening so much, not just in my area but everywhere. There needs to be something done to prevent someone from stealing" the converters.

- Another victim in Worcester, MA, had to pay a $1,000 deductible and lost access to their car for two weeks. <u>See</u> Victim #17.  They also had to pay for a rental car that cost them $120.

- Another victim in Abington, MA, suffered about $500 in costs due to the deductible, the tow, and gas. <u>See</u> Victim #18. They also lost use of their truck for over a week, had to use a vacation day, and the truck was not repaired to original condition.  This victim is a "solo parent without

a car" and "had to ask for rides to work and then borrowed a car" which was much less fuel efficient that added to the costs.

- An insulation business reported having to pay a $1,000 deductible for each of the two trucks that were targeted, and then bore labor and repair costs of $1,200. See Victim 19. That business also had to wait 30 days for their insurance company to pay the claims and by the time the money to repair was received, they lost a few months of use of the trucks.  The business reported that their "[t]wo trucks could not provide services to customers. Jobs were delayed. Workers had no work. Lost income because we could not preform work for clients."  The owners reported stress that was caused because they could go out and get their work done, and they wasted time replacing and repairing the vehicles, and noted the lost revenue and lost wages and work for their employees.

- An electrical company reported having to pay a $1,000 deductible and losing access to their truck for six days.  See Victim #20. They lost use of the "box truck used to deliver material/stock/tools to job sites" which "caused shipment delays, lost time, and delays to job schedules."

- An individual from Framingham, MA, reported that they had to pay a $500 deductible, but was able to get the repairs completed the same day. See Victim #21. The victim only had to lose a morning of work, but it was a "total inconvenience" because they work for an "hourly wage." The victim did note that it caused them "much stress and anxiety" regarding the "safety" of their family at home and caused them to spend another $500 in a quality security camera system.

- A home health care company reported having to pay about $6,000 in costs for rental vehicles. See Victim #22.

- An individual from Framingham, MA reported that they paid a $500 deductible of a $3,000 claim and lost their vehicle for about a week of repairs. See Victim #23.  The victim also "[l]ost a day of work because of dealing with insurance, car rental, AAA, and repair shop."

- A victim from Shrewsbury, MA, reported that they paid $2,318 in costs, and lost a day of work and their son did not go to school. See Victim #24.  This victim also reported that they suffered a "very strong financial and psychological shock from which I still cannot recover." Specifically, the victim had "great difficulty" in purchasing a car, and then about "two months later I had to pay another half of [the] cost of this car for repairs."

- A kitchen design company reported that they paid a $500 deductible and lost use of their truck for about 9 days. See Victim #25.  The business reported that "Each business day without a truck cost my company approximately $1000 per day related to lost business opportunities (product deliveries)." Aside from the business's bottom line, this also affected their customers as well. As the victim reported: "Each business day without a truck resulted in customers complaining that we could not deliver their materials. (We delivery critical building materials to homes undergoing kitchen renovations-delivery delays mean customers are without working kitchens.)"

- A sports company suffered $500 costs for the deductible off a total repair claim of $6,500. See Victim 26. They lost the use of the work van for over a month during repairs, and this negatively affected their marketing because the van carries the business information on it.

- An individual in Abington, MA reported that they paid a $500 deductible off a $1,784 repair bill. <u>See</u> Victim #28. They lost the use of the vehicle for repairs and lost about one and a half-days of work because they were unable to work without their vehicle.  This victim commented on the nature of the intrusion and believed "the theft was well planned and executed. The parking spaces are directly in front of our townhomes."

- An individual in Easthampton, MA reported having to pay a $1,000 deductible and $281 for a tow. <u>See</u> Victim #30. The victim lost the use of their car for three weeks and rented a car for a week. The victim is "disabled and it really put me off the edge. I was so upset, I couldn't go up and babysit my grandkids in Russell, so that I was really put out on that."

- A business in the construction company who had seven vehicles targeted reported that they spent over $7,770 on temporary fixes to their trucks and anti-theft devices.  As that business reported:

    The theft of the catalytic converters on 7 of our vehicles left us with the inability to utilize these 7 trucks and placed a significant strain on the remainder of our fleet, drivers, and warehouse staff. We value our commitment of Next Day delivery to our customers and this theft hindered our ability to meet our commitments.

    Due to the rampant theft of catalytic converters in our region; we were unable to source new parts for some time and were left with no option but to place temporary fixes on these trucks. We contracted with a local welder who was able to install a temporary fix so that we could get these trucks back on the road. This temporary repair took 5 days to complete on these trucks which again; significantly hindered our ability to deliver product to our customers. This temporary fix alone cost us $2,200.00.

    Although the cost of replacements and repairs is significant, the impact that actions had on our staff was far greater. The stresses of having to reschedule deliveries, move deliveries to other available vehicles, and all whilst ensuring our customers receive the same level of service that they would receive on any other given day. Our day to day is fast-paced yet extremely efficient and the stress of having our fleet impacted in this manner is one that we hope to never have to deal with again. To ensure that we do not have to face this ordeal in the future, we took the extreme measure of placing anti-theft devices in all of our fleet vehicles. The cost associated with these anti-theft devices was over $5500, in 2022. And this is something we continue to add to any new fleet vehicle we purchase.

    As stated above, the actions of had a great impact on our business. We incurred financial and delivery burdens as well as stress amongst our staff. And I can assure you that our Automobile policy premiums have been significantly impacted as well due to this incident. [The Defendants] should be held accountable for the crimes he has committed and our region should be able to feel safe against this happening again in the future.

<u>See</u> ECF #188-5.

These crimes had serious impacts on the victims' lives and businesses. While the impact is not measured in physical injuries, there were emotional injuries, practical difficulties, frustrations and stress that the crimes imposed, and significant financial setbacks that ensued.  There is a measure of just

punishment that must be reflected in the sentence when, as here, the Defendant targets others and steals the time and peace of mind from the lives of so many. The government asks the Court to impose the requested 33 months, which reflects the Defendant's role and participation in stealing, negatively affecting the lives of dozens of individuals and businesses, financially and emotionally, while profiting in the process.

### 3. Statistical Impact Following Arrests

The impact of the investigation and dismantling of this theft crew also cannot be overstated. And it should be directly considered by this Court in terms of the nature and circumstances of crime. Since the day of the coordinated takedown and arrests on April 12, 2023, there have been only nine (9) catalytic converter thefts reported to Mass Crime Net and NESPIN.[5] See ECF #188-1. By comparison, during the period of July 2022, through April 12, 2023, there were 258 catalytic converter theft incidents reported to Mass Crime Net and NESPIN (each incident generally comprised of multiple thefts taking place in a single city/town on a single night). The substance of this decline is also borne out by the dearth of media reports concerning catalytic converter thefts in Massachusetts since the arrests.

While this conspiracy was not responsible for every catalytic converter theft reported to Mass Crime Net during the period of July 2022, through April 12, 2023, the nearly complete cessation of catalytic converter theft in Massachusetts since this case was charged speaks to how prolific these conspirators were, and how this conspiracy in fact largely drove those numbers. This decline also speaks to the success shared by over 70 local police departments in Massachusetts and New Hampshire, Massachusetts State Police and FBI in turning the tide of this type of crime. In short, Massachusetts is no longer open for business to catalytic converter thieves, and the residents and businesses of this state no longer need to fear the loss of their catalytic converters in the same way they did before.

These Defendants were essentially professional catalytic converter thieves, with a dedicated fence

---

[5] Mass Crime Net is an information sharing platform hosted by the Massachusetts State Police. In this investigation, Mass Crime Net served as a coordinating entity and clearing house for catalytic converter theft incidents throughout the region. Apart from this investigation, Mass Crime Net receives reports of property crime and other incidents of regional note in order to facilitate information sharing, coordination among agencies, and promote officer awareness and public safety.

and ready access to the larger marketplace.  The removal of these five cutters and their dedicated fence, the aggressive prosecution by other components of DOJ of national entities responsible for buying stolen converters up the chain, and the passage of recent legislation in Massachusetts, have all combined to essentially end catalytic converter theft in the state of Massachusetts.  This astonishing statistical drop-off should give this Court insight into the nature and circumstances of this organized and sophisticated conspiracy, and how their crimes play into the larger landscape of catalytic converter thefts in this District. In short, these charged Defendants played an outsized role in this entire category of crime that is now largely extinct.  Based on this context, the Court's sentence can serve to ensure the continued eradication of this crime, and promote the sense of general deterrence seems to have been achieved.

A sentence of 33 months -- nearly 3 years -- sends the serious and appropriate deterrent message. Stealing from others and participation in a conspiracy of this nature for will merit a lengthy sentence that will separate you from society.  This is type of general deterrent message is all the more important for this Defendant who has a criminal record for violent offenses.

**B.     Thefts Committed by this Defendant**

This Defendant, Carlos Fonseca is responsible for over 100 catalytic converter thefts taking place between August 2022 through October 2022. See PSR 236. The Defendant committed all of these thefts with Rafael DAVILA and they proved to be an extremely successful pair.  Some nights were prolific, such as: thirteen converter thefts on August 30, 2022; fifteen converter thefts on September 13 ,2022; thirteen converter thefts on September 15, 2022; twenty-eight converter thefts on October 2, 2022; the thirteen converter thefts on October 4, 2022. These nights of theft are among the largest single-night hauls that occurred in this case.

**C.     Criminal History, Specific Deterrence, Just Punishment**

The Defendant's history of convictions should factor into the Court's decision. His prior domestic violence admission to sufficient facts, reflects a troubling incident in 2011, where the victim claimed the "the defendant punched her in the face multiple times with a closed fist, pushed her to the ground, held her down on the ground, tried to choke her, and threatened to kill her," and smashed her cell phone.  *See* PSR

¶266. The victim sustained injuries during the fight, including "swollen and bruised right eye, scratches, and dried blood on her left elbow," and the altercation had to be broken up by a bystander.  *See* PSR ¶266. The Defendant's second conviction was a case where he was indicted for assault and battery by means of a dangerous weapon in 2013. PSR ¶267.  He was sentenced to two years and served one. *See* PSR ¶267.

Put plainly, he is no stranger to the criminal justice system. From this, the Court can see the need to advance the goals of specific deterrence through an incarcerated sentence of 33 months. While the Defendant's offenses here did not involve violence, the Defendant's behavior has caused many more victims– and they can be measured in terms of the 100 catalytic converter thefts.  Had he been specifically deterred by his past sentence, he may not have found himself in these circumstances. Consequently, specific deterrence now, for these offenses, is all the more important.

Similarly, just punishment must also entail consideration of the sophisticated, coordinated and systematic targeting of catalytic converters by, essentially, a professional crew of thieves. The government requests this Court impose a sentence that reflects the seriousness of the Defendant's crimes, and one that is cognizant of the fact that this Defendant will not be deterred, except by incarceration.  A sentence of 33 months properly captures the Defendant's criminal history, will specifically deter him in a manner that prior sentences have failed to in the past, and will justly punish him for the dozens of victims he harmed

### D. General Deterrence, Promotion of Respect for the Law, and Public Protection

General deterrence and promotion of respect for the law must also be considered, and this Court should be extremely mindful of the message that the sentence will send to other catalytic converter thieves, and those would-be thieves.  To that end, this Court must ensure that the message of general deterrence is reflected by the sentences imposed in this case.

It is clear from the statistical decline described above that other professional criminals and thieves are watching this case.  This Defendant and the overall conspiracy are well known to other offenders, and the case made national news.  Fortunately, other thieves have taken the suggestion to stay away from Massachusetts as the state, local and federal response to such crimes will be overwhelming.  However, true deterrence and respect for the law are not messages that are sent through an extensive investigation, the

shock of arrests and pretrial detention.  These are but temporary measures.

Rather, the understanding of the type of sentence and penalty that one can expect for these crimes is the heart of deterrence under the sentencing factors and must inform this Court's sentence.  See Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800 (1974) ("An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses.").  Moreover, general deterrence and its impact must weigh heavily in this case, where the Court's sentence will be imposed in the only catalytic converter case brought in this District.  As a result, there is no prevailing sense that would otherwise inform criminals about the penalties for such crimes. Consequently, the context of this case and the nature of the crimes demonstrates that the need for a message of general deterrence is particularly strong.

Therefore, the government believes that the sentences in this case will serve as an example and warning to others, or, alternatively, an invitation. In the government's estimation, a very strong message of general deterrence is sent by a 33-month sentence.  Other criminals will understand that their thefts of catalytic converters will find them arrested and in Court, potentially facing a federal case, and multiple years in a federal prison.  They will understand that stealing from others on this scale is extremely serious, and will not be met with leniency or disinterest – certainly not by law enforcement and not by the Court. While a lengthy sentence may not prevent all forms of catalytic converter theft from returning, a 33-month sentence will ensure that the gains made by law enforcement in this area of crime do not quickly erode once the results of this case are known.

A sentence of 33-months will also protect the public from the Defendant, and further theft and burglary crimes. This is a sentence that will remove him from society and justly punish him for the wave of thefts he committed.  A sentence of 33-months imprisonment will also be the best means for the Court to protect the public generally and ensure that the vehicles and property owned by citizens in this District will not be targeted for the foreseeable future.  In short, public protection will be well-served by the government's recommendation – it will be accomplished through the Defendant's incarceration and

specifically deterring him from these crimes in the future, and a roughly 3-year sentence will deter others

from committing similar crimes as well.  Such a sentence will also promote respect for the law among those

victimized by these crimes and will let the public know that the law will not excuse this behavior.  Lastly,

the swiftly sentence -- given the Defendant's prompt acceptance of responsibility, and willingness to plead

guilty without litigation -- certainly promotes respect for the law.

## CONCLUSION

Based upon the foregoing, the government requests that the Court impose a sentence of 33 months,

followed by three years of supervised release.

Respectfully submitted,

JOSHUA S. LEVY,
Acting United States Attorney

By:      */s/ Philip A. Mallard* _____
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard* _____
PHILIP A. MALLARD
Assistant U.S. Attorney

Date:   November 4, 2024