UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Docket No. 23-CR-10127-LTS |
| CARLOS FONSECA | ) | |

**DEFENDANT CARLOS FONSECA'S SENTENCING MEMORANDUM**

From the outset, Carlos Fonseca accepted that his arrest in April 2023 was the product of his own poor decision-making.  He had spent his entire adult life working hard to improve his lot and support himself and his family but, following a series of unfortunate and unlucky financial challenges, in August 2022, he began a brief period (1 month and 12 days) during which he participated with Rafael Davila, in helping with the catalytic converter thefts to which he has pled guilty.  After the last of these thefts, in early morning hours of October 4, 2022, when he found himself returning from New Hampshire (they had traveled back roads to get there so he had not even realized they had left Massachusetts), he decided he was done and extracted himself from the criminal activity.

Although Mr. Fonseca did not participate in the RISE program, since his arrest and even before his arrest, he undertook his own program of self-improvement – intentionally and in an entirely self-motivated manner – to take responsibility for his life, care for his family, contribute to his community, and work to repair the harm done by his actions.  He asks that the Court consider these actions, as it would RISE participation, in deciding on an appropriate sentence and asks that he not be given any incarcerative sentence.

**Personal Background**

Mr. Fonseca is 34 years old.  (PSR at 2.)  He was born and raised in Holyoke, Massachusetts, where he has lived for all but two years of his life, 2021-2023, when he lived with his mother in Springfield, Massachusetts.  (PSR ¶ 280.)  His parents separated when he was one, and growing up he lived with his mother, stepfather (starting when he was age two or three) and siblings.  (Id. ¶ 281.) His father struggled with alcoholism through-out his life and, though he was present and involved during Mr. Fonseca's childhood, that was not without complication, and it was his mother and stepfather who provided him with care and stability.  (Id.)

Mr. Fonseca struggled with academics and at school. (Id. ¶ 302.)  As a child, he was diagnosed with attention deficit hyperactivity disorder (ADHD), and panic/anxiety disorder, and for a time as a teen, oppositional defiance disorder.  (Id. ¶¶ 300, 302.) Until high school, he was in special education and reading classes, but those classes were no longer an option in high school. (Id. ¶ 302.)  He had trouble focusing and did not learn to read until he was in 6th grade, and even then, he did not read well. (Id.)  He studied cosmetology and barbering and left school as a failing ninth grader with limited reading skills, to work as a barber and help support his family. (Id.)  He was hospitalized for emotional challenges at age 16, and left school shortly thereafter.  His older brother, Harry, supported and helped him with learning, but after he left for college, he really had no support. He received a high school equivalency diploma about one year after leaving school and taught himself to read since that time.  (Id.)

After working as a barber for a number of years, in 2013 at age 23, he took over the ownership of his uncle's barbershop, Highland Non-Stop Cuts, in Holyoke, Massachusetts, where he had been working.  (Id. ¶ 308.)  He owned and ran this shop until 2018.  (Id.)  In 2016,

Mr. Fonseca took on the ownership of a second barbershop, Hair Professionals in Chicopee, Massachusetts, which he ran as a sole proprietorship until 2018. (Id. ¶ 307.)  In 2018, Mr. Fonseca sold both of his barbershops in 2018, with the plan to work towards opening a convenience store.  (Id. ¶¶ 307, 308.)

Mr. Fonseca had joined the Laborers' Union, Local 999, in East Longmeadow, Massachusetts in July 2017, and worked at a paving company in Palmer, Massachusetts.  (Id. ¶ 306.)  He remained a member of the Laborers Union until January 2020.  (Id.)

Although he continued to work as a Laborer, in 2019, Mr. Fonseca also began working as a personal care assistant (PCA) for a nonprofit organization, Stavros, located in Springfield, Massachusetts.  (Id. ¶ 304.)  At Stavros he worked 24 hours a week assisting a person with a disability with the necessities of daily life, including preparing food, cleaning, food shopping, and driving to appointments. (Id.)  In addition, he worked 26 hours a week for his mother, providing the same kind of assistance, but also helping her with showing.  (Id.)

In early 2020, Mr. Fonseca embarked upon the convenience store business he had been working towards in a location in Chicopee, Massachusetts.  (Id. ¶ 305.)  With the monies he had made from the sales of his barbershop businesses, he obtained space, purchased equipment and began readying the business – Fonseca's Market – for operations.  (Id.) Unfortunately, opening the business was dependent on obtaining inspections and with the impacts from Covid-19 starting in the spring of 2020, obtaining the necessary inspections for nearly a year and he was not able to open the business until 2021.  (Id.)  The business was doing well for a time, but over the winter of 2021/2022, the pipes burst at the building where the store was located, causing considerable damage and requiring the store to close. (Id.)  There was an issue with the building owner's insurance, and disputes between insurance companies about who should pay to repair

the damage.  Despite the fact that he wasn't able to re-open the shop, he needed to continue to pay the monthly rent of $2,500.  Ultimately, after things dragged out for many months and because Mr. Fonseca was not able to re-open the business, and could not keep covering the costs, he decided to sell the equipment he had purchased for the store and move on. (Id.)

In 2022, Mr. Fonseca took over the ownership and operation of a pizzeria called Pizza D'Action, in Holyoke, Massachusetts.  (Id. ¶ 303.)  The pizzeria had been operational for decades, and Mr. Fonseca knew the owners, who were planning to retire and wanted someone to take over the business.  (Id.)  They agreed that Mr. Fonseca would buy the business, but because he did not have sufficient funds to buy the business outright, the agreement was that he would take over the operation and the ownership and would make monthly payments to the former owners for a time.  The initial challenges for Mr. Fonseca were that, at the outset, he needed to learn how to run the business and had not fully understood how the costs of the business impacted the earnings that he understood the business was making.  Mr. Fonseca worked for months without pay as he learned the business and used the funds generated by the business to pay his employees and the former owners.  Although Mr. Fonseca continued to work for Stavros as a PCA, (id. ¶ 304), money was quite tight.  In late 2022/early 2023, Mr. Fonseca closed the pizzeria to do a deep clean of the kitchen.  (Id.)  About three months later, in 2023, he re-opened, shortly before his arrest in April 2023.  (Id.)

Mr. Fonseca is father to three daughters, age 11, 10 and 3, and has always been a devoted and involved parent and a supportive and engaged co-parent to the two mothers of his children. (Id. ¶¶ 287, 289-294.)  Mr. Fonseca and the mother of his oldest daughter, Jesenia DeJesus, were in a long-term relationship starting from the time he was 13 years old and continuing to the time he was in his early twenties, separating when Ms. DeJesus went to college, and having a child

when she returned.  (Id. ¶ 287.)  Mr. Fonseca considers Ms. DeJesus to be his best friend, id, and

she, in turn, says that "[n]ot only is he my daughter's father, he is a very close friend of mine."

(Letter of Jesenia DeJesus, Exhibit 1.)  Mr. Fonseca and Jasmin Ortiz have two daughters

together.  (PSR ¶ 290.)   They have also known one another since high school and continue to be

close friends. (Id.) Both Ms. DeJesus and Ms. Ortiz describe Mr. Fonseca as "an amazing

father."  (Id. ¶ 296.)  Ms. Ortiz reports that "throughout the children's lives, he has proven that

he can be a loving, supportive and involved dad.  He has brought so much stability and happiness

into the kids' lives." (Letter of Jasmin Ortiz, Exhibit 2.)  Ms. DeJesus says that she has

"witnessed Carlos' being a phenomenal father to [their] child.  He has never missed any

important events or activities for [their] daughter." (DeJesus letter at 1.)  She adds that, "for the

last several years, [Mr. Fonseca] has been the one to bring [their daughter] to all doctor

appointments such as physicals, pulmonologist, and optometrist appointments." (Id.) Both

women note that he is supportive of them, as well.  (Id., PSR ¶ 296).

     Mr. Fonseca has "always taken pride [in] … being the best father … that [he] could be."

(Letter of Carlos Fonseca, Exhibit 3.)  He sees and cares for his daughters at least six days each

week.  Because he has had more flexibility in his schedule because he has owned his own

businesses, he picks up all three of his daughters from school or day care each day, and they

spend each afternoon with him.  (PSR ¶¶ 289, 291, 292, 293.)   Since each was very young, they

have had a weekly overnight with him, spending every Friday to Saturday, staying with him.

(Id.)  For his two oldest daughters, he has coached their basketball team – the Lady Knights – for

about three years, since approximately 2021.  Pictures of Mr. Fonseca with his daughters, after

church, at the beach, on an outing to Six Flags, dressed up for a Valentine's Day photoshoot, and

celebrating a championship basketball win, give some sense of the bonds he has with them and his commitment to being a good parent to his children.  (Photos attached as Exhibit 4.)

### Prior Record

Mr. Fonseca has one prior conviction for assault and battery with a dangerous weapon from an incident eleven (11) years ago when he was 23 years old. (PSR ¶ 267.)  The incident occurred on a night when Mr. Fonseca was out with a friend celebrating his birthday.  The friend had consumed too much alcohol and was throwing up in the parking lot of a bar, when a group of people came out of the bar with pool sticks, one of whom identified himself as the owner of the bar and told them to leave. Although a physical confrontation ensued, Mr. Fonseca says that the video footage of the fight made it clear that the other individuals (who, he later learned, all worked as correctional officers) initiated the fight. Mr. Fonseca was charged as a joint venturer and served as committed sentence as a result of his conviction. He was fully compliant with the conditions of his probation upon his release, (id.), and has no other convictions.

In addition to this one prior conviction, Mr. Fonseca had a case stemming from an incident between him and Ms. DeJesus in 2011 when he was 21 years old, which led to him receiving a continuance without a finding.  (PSR ¶ 266.)  Although Mr. Fonseca regrets his behavior towards Ms. DeJesus that day, he is glad that she went to the police because it taught him an important lesson.  As a result of the case, he took an anger management class and, in the long run, he feels that he and Ms. DeJesus were able to create a stronger bond.

### Involvement in this Case

Mr. Fonseca admits and accepts responsibility for his involvement in the catalytic converter thefts he helped Rafael Davila commit on thirteen days over a six (6) week period starting on August 23, 2022, and ending on October 4, 2022. (PSR ¶ 266.)  Mr. Fonseca's

primary role was to act as a look-out, and only participated in the actual cutting out of carburetors on two occasions. He did not participate in any of the planning, he never drove a vehicle for others, and he had no idea about the scope or workings of the operation.

Mr. Fonseca left the operation immediately after one night of activities took him outside of Massachusetts.  Because they had taken back roads to get where they were going, it was not until they crossed the Massachusetts state line in the early morning hours of October 4, 2022, that Mr. Fonseca realized that he and Mr. Davila had been in New Hampshire. That night marked the end of Mr. Fonseca's participation in the thefts.

On the date of the next thefts, communications between Rafael and Nicolas Davila makes it clear that Mr. Fonseca had conveyed to Mr. Davila that he "could not work" that night. (Affidavit of Christopher Ryan ¶ 207, Doc. 4-1.)  In fact, Mr. Fonseca changed his phone number and declined any further involvement in the operation that night, more than six months before any arrests were made.  Indeed, records from the investigation indicate that the phone that Mr. Fonseca used during this operation was terminated on October 13, 2022.  (PSR ¶ 50.) He stopped going to his usual barber to ensure that he would not run into Mr. Davila.

Although he is not seeking to excuse his own behavior, it should be noted that Mr. Fonseca was involved in these crimes at a time when he had just experienced the failure of the convenience store business that he had invested all his savings and two years of work, to start, following the flooding that closed the store.  (Id. ¶ 305.)  He had just had his third child and the mother of that child was taking some time off after the baby was born and was relying on him to help more financially.  He was incredibly concerned about how he was going to provide the financial support his family needed.  Although he was starting a new business, the pizzeria, that was very much in the "getting off the ground" stage and he was far from profitable.  In fact,

having invested everything he had into buying the pizzeria, he feared losing a second business. In addition to his family, he felt responsibility for the pizzeria's employees, who he used all the income he generated during this period to pay, not taking any pay for himself. (Id. ¶ 303.)  Mr. Fonseca is quite clear that he never would have participated in these thefts had he not been experiencing the financial hardship he was experiencing at the time.

Mr. Fonseca was arrested on April 12, 2023, and was released the next day.  (Id. ¶ 1.) Although Mr. Fonseca decided very early on that he wanted to plead guilty to the charges and accept responsibility, there were a range of legal issues related to the charges that needed to be examined and discussed before he was able to arrive at a plea agreement with the government. On March 18, 2024, Mr. Fonseca entered a plea of guilty to the conspiracy charge (Count 1), and the substantive charge of interstate transportation of stolen good on October 4, 2022 (Count 2). (Id. ¶ 2; Indictment, Doc. 41.)  This Court initially scheduled a sentencing hearing for June 21, 2024, (Doc. 199), but this sentencing has been continued several times to enable Mr. Fonseca to participate in and complete the restorative justice program.

**Actions Since his Involvement in Thefts and Subsequent Arrest in this Case**

It has been more than two years since he engaged in the last acts related to the case, and and more than a year-and-a-half since his arrest and release following that arrest. Although Mr. Fonseca did not apply to participate in the RISE program, in large part based on the assessment of counsel that he would not be deemed to meet criteria because he had so many positive things that he, himself, was pursuing independently, in lieu of that, he undertook a self-guided program of self-improvement. He had the following goals for himself:

1. Work productively to make his business a viable source of income to support himself and his family.
2. Continue to support his children and be a figure upon whom they could rely for unconditional love, support and guidance.

3. Continue to support his children's mothers as co-parents and in their efforts to continue to develop and thrive.

4. Continue to support his community, by being a positive and productive contributor.

5. Work to understand the harms his actions caused and take steps to ameliorate those harms.

He has worked hard to pursue each of these goals, with much success.


*Goal #1:*      *Work productively to make his business a viable source of income to support himself and his family*

In late 2022, Mr. Fonseca was actively working on taking over ownership of the pizzeria. (PSR ¶ 303.) As noted above, he worked hard to learn the business and, as he did and over time, he turned it into a profitable operation. Mr. Fonseca worked more than full-time to rebuild this business and the community connections that, ultimately, made it thrive. Although he initially feared the impact his arrest would have on the business, he has been heartened with the wide-spread community support that he, and the business enjoys.

9

In the spring of 2024, anticipating that he would soon be sentenced and in an effort to ensure that the business would remain operational should he receive a sentence of incarceration, he took on a business partner, and who he trained to run the business in his absence.  (Id.) With the delays in his sentencing, at some point it became clear to Mr. Fonseca that would need to transfer the pizzeria to his business partner because he could not expect him to wait longer than originally expected and discussed, and as of August 2024, Mr. Fonseca no longer has an interest in the business.  (Id.)

Mr. Fonseca has been actively making plans for ways he could support himself going forward, having sold the business.  He explored the possibility of getting a commercial drivers' license (CDL), to gain the skills necessary to get a trucking job, at the time, the costs for the training for that program, at $8,500, were prohibitive.  Obtaining this licensure remains an option for him going forward, when he has the means to pay for the training.

Another option for Mr. Fonseca, which did not make sense to embark upon before his sentencing, is to go back to the Laborers' Union and work as a journeyman.  He has always paid his union dues, so this remains an option for him, but it is not his first choice for work going forward, because of how hard that work in on his body.  That said, he will absolutely do this work if need be going forward.

In the fall of 2024, Mr. Fonseca enrolled in an Autobody Appraisal class at Springfield Technical Community College with an eye towards obtaining licensure.  He has nearly completed that course, which is set to wrap up in late November 2024.  The next steps for him, which he will pursue as soon as he is able to do so, will be to do a three-month apprenticeship (a required step for licensure), and then take the licensure exam.  (Motor Vehicle Damage Appraiser Licensing Requirements, https://www.mass.gov/info-details/licensing-requirements-

motor-vehicle-damage-appraiser).  Mr. Fonseca is enthusiastic about gaining this credential and entering into this field as a licensed appraiser.

In short, Mr. Fonseca has plans, and back up plans, for supporting himself and his family going forward.  In the event he does not receive an incarcerative sentence, he will find an appraisal apprenticeship to start as soon as possible with an eye towards becoming licensed and starting work in this field.

> *Goal #2:*     *Continue to support his children and be a figure upon whom they can rely for unconditional love, support and guidance.*

As set out in detail above, Mr. Fonseca is committed to his children and wants nothing more to continue to be in their lives as a parent and supporter.  He spends regular time with them at least six, and usually seven, days a week.  He picks them up from school and spends the afternoons with them, coaches their basketball teams, attends church with them, takes them on outings and to doctors' appointments and provides financial support for them.

Mr. Fonseca also works to support his children's emotional well-being.  For example, one of his daughters who was present at the time Mr. Fonseca was arrested, has been particularly impacted by that event and by her fears and emotions about his situation.  (Exhibit 1, at 2).  Mr. Fonseca, and her mother, have arranged for counseling to deal with the emotional stress of their situation.  One of his co-parents says:  I can attest to the closeness between Carlos and our daughters[.]. He always puts their needs first, spent quality time with them, took part in their education and had one-on-one emotional support.  (Exhibit 2.).  Mr. Fonseca has never waivered in understanding in the importance of his job as parent to his children, or in showing up to be the parent they need.

> Goal #3:     Continue to support his children's mothers as co-parents and in their
>              efforts to continue to develop and thrive.

Mr. Fonseca has continued to be a good and collaborative co-parent and provides support

to each of his children's mothers to enable them to work and grow.  One of his co-parents writes

of her relationship with Mr. Fonseca:  "Throughout the years we have built positive strong

relationships to raise our daughter."  (Exhibit 1, at 1.)  She continues, "I am proud to say he is an

amazing father who I can call at any moment to show up to support our daughter.  As a teacher

my schedule limits me from taking time off.  … He supports me immensely by taking [our

daughter] [to enable me] to start my licensure this summer to become an administrator."  (Id.;

PSR ¶ 296.) Mr. Fonseca's other co-parent has also been pursuing her education, and because of

this, has had periods when she was working only on a very part time basis.  During these periods,

Mr. Fonseca has taken on more of the day-to-day parenting and contributed as much as he could

financially as support.

> Goal #4:     Continue to support his community, by being a positive and productive
>              contributor.

Mr. Fonseca is, and has been, a positive part of the fabric of his community.  Mr. Fonseca

cares deeply about being a positively contributing member of his community and, since his

involvement with these crimes and following his arrest, his commitment to do good has grown

even more.  He contributes to his community in myriad ways and intends to continue to follow

through and demonstrate that commitment, particularly by mentoring and being present for the

young people in his community.

To start, Mr. Fonseca has always viewed his pizzeria as an important part of the

community and in taking over its ownership, wanted to revitalize its presence in and engagement

with the community.  One way he has done this is actively supporting community activities and creating a space for the community to come together to celebrate.

For the past eight years (or so), Mr. Fonseca has played softball in the Holyoke Adult Softball League, in Holyoke, Massachusetts.  As a business owner, he has sponsored both men's and coed teams in the league throughout this time.  Kevin Ross, league Director, says that not only is Mr. Fonseca a person that he has never had any issue with, he is also someone that he "has been a neutral party several times between [him] and [his] predominantly Spanish teams …. Settl[ing the] peace … more than once."  (Letter of Kevin Ross, Exhibit 5.). Mr. Fonseca, who is a physically active person, also plays football and goes to the gym regularly, which are additional ways he participates in his community and has pro-social engagements. (PSR ¶¶ 298, 299.)

As mentioned above, Mr. Fonseca has long coached his daughters' basketball team.  Over the past several years, as the young people in his team get older and they have more ability to compete, these activities have involved more time spent in practices and in tournaments.  He is also a committed part of youth basketball more generally.  For example, while his daughters played on a separate team, he coached another team of young people in the Springfield "All Stars" game.  Photographs of Mr. Fonseca with his "All Stars" basketball team, and adult league softball team are attached as Exhibit 6.

Following his arrest, Mr. Fonseca decided that he wanted to find additional ways to give back and support his community, and actively sought out volunteer activities.  His first impulse was to engage with youth mentoring, but his criminal record and pending case made that more difficult and, for the time it seemed that was not going to be workable.  He eventually found a community service opportunity at Nueva Esperanza in Holyoke, Massachusetts, which describes

itself as "a community development organization dedicated to meeting the needs of the entire Puerto Rican/Afro-Carribean Community." (https://nuevaofholyoke.org/) Mr. Fonseca has become a regular volunteer for this organization, originally working at least two, five-to-ten hour days each week. With the increasing commitment required for the Lady Knights, he has had to reduce this to one day a week, but he remains a committed and reliable volunteer. (PSR ¶ 294.). He helps with building maintenance and repairs, working at events, gatherings and celebrations at the center, and providing assistance to "community members seeking assistance, providing them with resources and guidance or directing them to other organizations that can offer further support." (Letter of Kayla Rodriguez, Exhibit 7.) The Executive Director of Nueva Esperanza says that "his dedication and commitment to our organization have been evident in his willingness to go above and beyond to assist our staff and community members. Despite our limited staffing, Mr. Fonseca has seamlessly integrated into our team, offering his support with a positive attitude and willingness to assist wherever needed." (Id.)

> Goal #5:     *Work to understand the harms his actions caused and take steps to ameliorate those harms.*

In addition to engaging in self-reflection about why he had participated in the catalytic converter thefts and reviewing the victim letters he has seen that have been submitted in this case, when Mr. Fonseca learned about the court's restorative justice (RJ) program in approximately November 2023, he decided he wanted to try to participate in it. In exploring that possibility, he learned that there were budgetary issues that had placed the restorative justice program on hold, but that there were hopes that that would be resolved in early 2024. When the program did get up and running in the late spring, he was an enthusiastic participant. He has now completed all four components of the restorative justice program – including the two

14

mandatory components, as well as the two optional components.  (PSR ¶ 4.)  It has been, he says, "very impactful" for him.  (Exhibit 3.)

From the outset of the program, Mr. Fonseca was struck with hearing one from Sam, one of the RJ instructors, who shared that after going to prison for murder, he had changed his whole life, and now works as a professor at Boston University. Mr. Fonseca says, "There's a quote that will forever stick with me by Sam, … "Our actions define us, but do not define who we can become."  (Id.)

Mr. Fonseca participated in the two-day Restorative Justice Workshop on May 23-24, 2024. He was hugely enthusiastic about the workshop and reported that "it was one of the most powerful environments I've ever been in."  He also completed a five-week reading group in July and August 2024 and had the opportunity to read about an array of meaningful issues including about the impacts of crime including dehumanization, disruption of community and disrespect.

Mr. Fonseca was able to engage in the last phase of the RJ program this past Monday, November 4, when he had an individual restorative meeting with a person who had been a victim of catalytic converter thefts in California.  (RJ organizers were not able to identify a victim in this case who was willing or able to participate but did find a surrogate victim from another case.). During the approximately 1.5-hour meeting, Mr. Fonseca was able to share his reflections on what had caused him to make the choices he did, and to hear from the man he met with, how the thefts he had experiences affected him, and his family, mentally and emotionally.  The surrogate victim said that he thought it would have been nice to have gotten some form of apology from the individuals who had victimized him. Mr. Fonseca and others present at the meeting, discussed that writing a letter to the victims in this case, would be something that Mr. Fonseca could do, and he conveyed that it was something that he does want to do.  He and RJ

leaders intend to follow up with one another about this.  Another outcome of that meeting is that the surrogate victim said that he intends to share the RJ program with his daughter, who is a public defender, to see if they can get something similar to it started where he is.

Mr. Fonseca is greatly appreciative of having had the chance to participate in the RJ program and intends to use the learnings he garnered from it, to guide and motivate his actions in the future.

### What others say about Mr. Fonseca

Without repeating what is included above, those who know Mr. Fonseca best have shared their perceptions of who he is and how he operates in the world. He is described as "trustworthy, hard working and intelligent," (Exhibit 1), as a person of "integrity and compassion," (Letter of Carolyne Morera, Exhibit 8), and as his brother puts it, "an amazing human being … and the only person in the world I trust with my life."  (Letter of Harry Colon, Exhibit 9.)  Mr. Fonseca's mother, says that he "has always been a beacon of strength and support in our family."  (Exhibit 8.)  She adds, "Beyond our home, Carlos is known in our community for his kindness and willingness to help those in need."  (Id.)

We hope that these insights into Mr. Fonseca, combine with his own efforts and behaviors, will inform the Court as it considers its sentencing decisions.

### Guidelines Calculations

*Loss Amount*

The government and probation estimate the loss amount attributable to Mr. Fonseca as being approximately $515,000 based on the fact that Mr. Fonseca was involved in the theft of 103 vehicles, and they estimate the loss to be $5,000 per vehicle.  Mr. Fonseca objects to this calculation and contends that it overstates the losses, given data that "the cost to replace a

catalytic converter can range from the high hundreds of dollars to as much as $4,000, depending on the model of the vehicle and where you have it replaced." John Goreham, *How Much Does It Cost to Replace a Catalytic Converter*, (Car Talk, 2024), https://www.cartalk.com/parts-services/how-much-does-it-cost-to-replace-catalytic-converter. Thus, if the loss per stolen catalytic converter were $800, the loss amount for 103 vehicles would be $82,400. If the loss per catalytic converter were $1000, the total loss would be $103,000. With those numbers, the Specific Offense Characteristics related to loss, would increase the base offense level of 6 by an additional 6 points, or an additional 8 points respectively, pursuant to the United States Sentencing Guidelines (U.S.S.G.) Section 2B1.1(b)(1), not the additional 12 points added by Probation based on the estimated loss of $515,000. (PSR ¶ 252.)

 Mr. Fonseca understands that the Government contends that the loss amounts are higher based on the types of vehicles impacted and should be increased to include losses to the various businesses due to the thefts, but the Government does articulate how it calculated those losses here. The rule of lenity should inure to the benefit of Mr. Fonseca in undertaking these calculations.

 *Sophisticated Means*

 The Government contends that there should be a two-point enhancement for sophisticated means utilized to undertake the thefts in this case. Even assuming there could be an argument that such an enhancement applies (and the Probation Department does not find that it does), it fails to articulate any basis for concluding that Mr Fonseca had any involvement in engaging in the "sophistication" of this scheme. There is no evidence that he had any role in planning, or even that he knew anything more about the plan beyond the theft of the devices. Understanding

that these stolen parts would be sold, does not render Mr. Fonseca responsible for the type of behavior that might warrant an enhancement under sophisticated means.

*Role reduction*

Mr. Fonseca contends that he should be given a mitigating role adjustment pursuant to U.S.S.G. § 3B1.2, because he was a minimal or minor participant in the charged activity and performed a limited function in the criminal activity, and he objects to the Probation Department's failure to give him such an adjustment.  (PSR ¶ 256.). In the Probation Officer's Response to Mr. Fonseca's objection, she notes that "[a] defendant's lack of knowledge or understanding of the scope and structure of the enterprise is indicative of a role as a minimal participant."  (PSR at 92.)  This is precisely the reason that Mr. Fonseca should receive this reduction.  His role in the enterprise was to accompany Mr. Rafael Davila when asked, and to serve as a look out when the thefts were being done.  Mr. Fonseca had no knowledge or understanding of the scope and structure of the enterprise, and there is no evidence that he did. The "enterprise" in this case was made up of:

> Rafael Davila:  Identified as "the leader of the organized crew of catalytic converter thieves," (PSR ¶ 23), who "committed burglaries of jewelry stores and stole snowblowers, motor vehicles and trailers," (id. ¶ 24).  He also conducted a burglary of a storage facility and stole tools that were monetized through a co-conspirator known to investigators as CC-2.  (Id.)

> Jose Torres:  Identified as "a middle-man in the monetization of the stolen catalytic converters" buying stolen catalytic converters from "cutters" and selling them to scrap dealers and other buyers.  Torres was identified as transporting thousands of catalytic converters to Connecticut, Rhode Island, New York and New Jersey.  (Id. ¶ 37.)

> Alex Oyola:  Identified a committing multiple bank thefts with Rafael Davila and Feliberty, as well as two jewelry store burglaries, the theft of a trailer and a snowblower. (Id. ¶ 59.)

<u>CC-2</u>:  Identified as a co-conspirator know to investigators who monetized stolen jewelry, and other stolen property including stolen tools. (<u>Id</u>. ¶ 24.)

<u>Santo Feliberty</u>: Identified as participating in catalytic converter thefts, bank thefts, and jewelry store burglaries, and a theft of a trailer and snowblowers.  (<u>Id</u>. ¶ 564)

<u>Nicolas Davila</u>: Identified as a person participating in catalytic converter thefts with his brother, Rafael Davila.  (<u>Id</u>. ¶ 43.). He also discussed monetizing stolen catalytic converters through Torres, (<u>id</u>. ¶ 45), discussed dropping a firearm and needing an additional magazine for it, (<u>id</u>. ¶ 46), and discussed drug sales and a new potential source of supply and prices for a kilo of drugs, (<u>id</u>. ¶ 48).

<u>Zachary Marshall</u>:  Identified as a person participating in catalytic converter thefts, as well as committing a burglary of a storage facility with Rafael Davila.  (<u>Id</u>. ¶ 51.). Evidence also revealed communications with Rafael Davila about the process of transporting and monetizing stolen catalytic converters, and the sale of stolen catalytic converters to dealers outside of Massachusetts.  (<u>Id</u>. ¶ 53.)

Without minimizing Mr. Fonseca's actions, it seems clear when one reviews the respective actions, roles and knowledge of others, that Mr. Fonseca was not involved to a degree that was comparable to the roles of the other people charged in this case.

*Criminal history*

Mr. Fonseca objects to attributing one criminal history point to a continuance without a finding charge that was imposed on January 30, 2012, (PSR ¶ 266), because these charges do not fall within the 10-year period set out is U.S.S.G. § 4A1.2(e)(2).  The earliest of the allegations against Mr. Fonseca in this case occurred on August 23, 2022, see (PSR ¶ 64), more than ten-years after January 30, 2012, and thus should not be considered a "prior sentence" under U.S.S.G. § 4A1.1(c).

The Probation Officer responds that the conspiracy charged in Count 1 allegedly took place between January 1, 2022, and April 12, 2023, and that "there is no indication on the record that the defendant restricted his plea to a specific timeframe."  (PSR at 93.) Although undersigned counsel does not have a transcript of the Rule 11 hearing, she does have notes of the

19

factual basis for the plea presented by the Assistant United States Attorney at that hearing, who stated that law enforcement became aware of the Maroon Acura MDX being involved in thefts, and that "this defendant participated in a conspiracy to steal catalytic converters" for the period "August 2022 to October 4, 2022." The prosecutor then listed the individual dates and thefts. In short, there was evidence at the change of plea hearing about the dates of Mr. Fonseca's participation in the conspiracy, and those dates do not fall within the ten-year period that ended January 30, 2022, and no points should be attributed for this case.

### 18 U.S.C. § 3553

As set forth at length above, Mr. Fonseca should be sentenced as though he were a successful participant in the RISE program because, in the nineteen (19) months since his arrest, and the more than two years since his last criminal activity, he has committed himself to ensuring that he never again engages in criminal activity. He has worked to understand the harms he created with his involvement in this case and has and will continue to take further actions to remedy these harms.

A sentencing imposing any conditions of supervised release that the Court deems reasonable or necessary, will be sufficient, but not greater than necessary to satisfy the dictates of 18 U.S.C. § 3553. Any incarcerative sentence would be more than is necessary to comply with the purposes of that statute. Counsel will be prepared to address the application of these 18 U.S.C. § 3553 factors at the upcoming sentencing hearing for Mr. Fonseca.

**Request to Self-Report in the Event of an Incarcerative Sentence**

In the event that the Court imposes an incarcerative sentence, Mr. Fonseca asks that he be able to self-report at some point in December, so that he can complete the autobody appraisal course he is taking that runs through late November.  Both the Government and Probation have indicated that they would not have an issue with him self-reporting.

Respectfully submitted,

Inga S. Bernstein (BBO #627251)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020

November 6, 2024

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by electronic filing on November 6, 2024.

/s/ Inga S. Bernstein